UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| AMANDA LANGLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:15-CV-161-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Amanda Langley ("Langley") application for disability insurance benefits.

### I. Background

Langley was born in 1980, and she alleged that she became disabled beginning September 2, 2008. Langley alleged disability based upon severe asthma, scoliosis, endometriosis, hypoxemia,[1] a learning disability and obesity. (Tr. 63).

The Social Security Administration ("SSA") denied Langley's application for benefits, and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Langley's request and a hearing was held on March 9, 2011. The ALJ issued a written decision on May 20, 2011, upholding the denial of benefits. (Tr. 14). Langley filed a timely Request for Review of Hearing Decision with the Appeals Council (Tr. 7). The Appeals

---

[1] Hypoxemia is a below-normal level of oxygen in your blood, specifically in the arteries. *See* http://www.mayoclinic.org/symptoms/hypoxemia/basics/definition/sym-20050930 (last visited August 19, 2016).

Council denied Langley's Request for Review. (Tr. 1-3). The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Langley filed this appeal on September 10, 2015. (ECF No. 1). Langley filed a Brief in Support of her Complaint on December 14, 2015. (ECF No. 10). The Commissioner filed a Brief in Support of the Answer on March 11, 2016. (ECF No. 16). Langley filed a Reply Brief on March 25, 2016. (ECF No. 17).

## II.     Decision of the ALJ

The ALJ found that Langley had the following severe combination of impairments: asthma/bronchitis, obesity, scoliosis and questionable borderline intellectual functioning. (Tr. 19). The ALJ, however, determined that Langley did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20). The ALJ found that Langley had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 416.967(b), meaning that she can lift-carry 20 pounds occasionally and 10 pounds frequently, stand/walk a total of 6 hours in 8, except that she should avoid climbing ladders, ropes, and scaffolds and can only occasionally balance, kneel, crouch, crawl, and stoop. She can occasionally climb ramps and stairs, and she should avoid concentrated exposure to pulmonary irritants and prolonged exposure to extreme heat or cold. Mentally, the claimant was limited to performing simple routine tasks. (Tr. 21). The ALJ found that Langley was unable to perform any past relevant work. (Tr. 28). The ALJ determined that, based on Langley's RFC, jobs exist in significant numbers in the national economy that Langley could perform. (Tr. 28). Consequently, the ALJ found that Langley was not disabled. (Tr. 28).

## III.    Administrative Record

The following is a summary of relevant evidence before the ALJ.

A.     **Hearing Testimony**

Langley testified on March 9, 2011, as follows:

She was born in 1980 and went to school until the 11th grade. (Tr. 37). She took General Education Diploma ("GED") classes but did not take the GED. (Tr. 37). She got her driver's license in 2002, when she was 22. (Tr. 38). She got divorced in 2007. (Tr. 38). She has three children aged: 13, 12 and 9. She lives with her children, her boyfriend, and her boyfriend's mother. (Tr. 38). She's lived with them since June 2010. Before that, she and her boyfriend lived in their own house. (Tr. 39). She has been with her boyfriend for four years. (Tr. 39). Her boyfriend and her kids do a lot of the house work. (Tr. 39). Her boyfriend is disabled: he was born with spinal meningitis and it "fried the front part of his brain." (Tr. 39). They met at Kinfolks, a restaurant where they both worked. (Tr. 39). She met her boyfriend in September 2007. (Tr. 39). She receives $149/month as "wife's benefits" from her first husband and her kids receive $149/month as well. (Tr. 39). She also receives food stamps. (Tr. 40).

Langley became disabled September 2, 2008. (Tr. 40). On that date, she was working at Kinfolks and she collapsed with a lung infection. (Tr. 40). Kinfolks fired Langley when she returned to work. (Tr. 40). She has been out of work since then. She has applied for jobs but no one will hire her. (Tr. 40). She most recently applied for a job last year at McDonald's. (Tr. 40).

She has had difficulty with learning her jobs in the past. (Tr. 41). She could not understand how to use a cash register. (Tr. 41).

She has had trouble with her lungs since 1996. (Tr. 41). She is short of breath all the time. (Tr. 41). Temperatures impact her breathing. (Tr. 41). She has to go on breathing

3

treatments at the hospital and take steroids. (Tr. 41). Her lungs do not cause her any problems unless she is having one of her attacks. It can take her 3-4 hours to return to normal functioning after a breathing attack. (Tr. 42). Sometimes her breathing attacks will make it difficult for her to care for her children. (Tr. 42). She can be in bed for two to three days at a time. (Tr. 42). At home, she uses a nebulizer every two hours. (Tr. 42). The nebulizer makes her shaky such that she cannot hold a cup without a lid or her children. (Tr. 42-43). She has been taking these medications for her breathing since 1996. (Tr. 43).

She also has problems with her mood. (Tr. 43). It depresses her that she cannot play with her kids. (Tr. 43).

Her boyfriend helps with the housework. (Tr. 43-44). She can do dishes, but not vacuuming, sweeping, mopping or laundry because of her asthma. (Tr. 44). Her boyfriend or his mother does the grocery shopping. (Tr. 44). She helps with her kids' social studies homework but she cannot help them with their math homework. (Tr. 44). She was in special education classes at school. (Tr. 44).

She got her driver's license at age 22. (Tr. 45). She took the driver's test two times. (Tr. 45). She claims she didn't get her license sooner because she put the answers in the wrong spot.

She drives only once in a while. (Tr. 45). Her boyfriend's mother drove her to this hearing.

She does not belong to any clubs or social organizations. (Tr. 46). She has no hobbies. (Tr. 46).

The heaviest amount she can lift or carry is 15 pounds. (Tr. 46). She can stand for 30 minutes before needing to sit down. (Tr. 46). She can walk a half of a mile. (Tr. 46). She can sit for 30 minutes or an hour. (Tr. 46).

4

Her nebulizer takes 30 minutes to work. (Tr. 46). She takes Albuterol, Advair, Singulair, Cimbacort, ProAir, Prednisone, Musinex, Prilosec, and Zyrtec. (Tr. 47). She takes Ibuprofen for migraine headaches. She takes no medication for depression. (Tr. 47).

Vocational expert Margaret Ford testified as follows:

Claimant's past work would be categorized as kitchen helper, fast food worker, fast food cook, and waitress. (Tr. 48).

The first hypothetical person was assumed to be a younger individual (under 50) with a limited eleventh grade education and the past work history identified. The hypothetical person could do light work which involves lifting 20 pounds occasionally, 10 pounds frequently; standing and walking a total of 6 hours in an 8 hour day; sitting a total of 6 hours in an 8 hour day; no ladders, ropes or scaffolds; balancing, kneeling, stooping, crouching, crawling, and climbing ramps and stairs only occasionally; no concentrated exposure to pulmonary irritants; no prolonged exposure to extreme heat or cold; and limited to simple routine tasks. (Tr. 49).

The second hypothetical was assumed to have the same restrictions, except the person would be limited to sedentary work. (Tr. 49).

The first hypothetical person would not be able to do any past relevant work. (Tr. 49). However, the first hypothetical person would be able to perform work as an assembler, bench hand, and table worker. (Tr. 50). These are only a sample of the jobs available. (Tr. 51). The bench hand and table worker positions are both sedentary positions. A person would get 15 minute breaks in the morning and in the afternoon and a 30 minute break for lunch. A person would have to be on task 80-85 percent of the time. (Tr. 51). If a person stopped work every 2 hours for 30 minutes, then that would preclude work. (Tr. 51). A person could only be absent one day a month. (Tr. 51).

5

## B. Medical Evaluations

Langley's relevant medical evaluations are summarized as follows:

On August 4, 2009, Langley was seen by Clinical Psychologist Jonathan D. Rosenboom. (Tr. 263-70). Rosenboom diagnosed her with anxiety disorder and a learning disorder, and he assigned Langley a GAF of 62.

On August 5, 2009, Langley filled out a Function Report-Adult. (Tr. 156-66). Langley states she cannot do any house or yard work because of her asthma. (Tr. 158). She must always be with someone because of her asthma.

On November 17, 2009, Langley was seen by Clinical Psychologist Jonathan D. Rosenboom. (Tr. 279-82). Rosenboom diagnosed Langley with Borderline Intellectual Functioning ("BIF"), in addition to Anxiety Disorder and Learning Disorder. He stated that Langley does not have the capacity to manage her finances. Rosenboom assigned Langley a verbal IQ score of 71, performance scale IQ score of 72, and a full scale IQ score of 69. (Tr. 280-81).

On December 15, 2009, a Psychiatric Review was conducted by James Morgan, Ph.D. (Tr. 285-98). Langley was found to have anxiety related disorders and BIF. She had only mild restrictions in the activities of daily living and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 293). Morgan found that Langley has a diagnosis of BIF but her functioning was not markedly impaired. Morgan determined that Langley was capable of performing simple, one to two step tasks. (Tr. 298).

On December 11, 2009, Medical Consultant James Alexander performed a Physical Residual Functional Capacity Assessment. (Tr. 57-62). He determined that Langley could occasionally lift 20 pounds; frequently lift 10 pounds; stand for about 6 hours in an 8 hour work

day; sit for about 6 hours in an 8 hour workday; occasionally climb ramps and stairs, occasionally climb ladders, rope, and scaffolds; occasionally kneel; avoid concentrated exposure to extreme cold and heat. Alexander found that Langley's reported limitations are not consistent with the whole evidence and are considered only partially credible.

## IV.   Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these

7

impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

V.  **Discussion**

   A.   **12.05C**

Langley claims that the ALJ erred by failing to find that Langley met or equaled Listing 12.05C. (ECF No. 10 at 7). "[T]o meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006)

Langley notes that she has a valid IQ score to satisfy the requirements of the listing. (ECF No. 10 at 8). Rosenboom assigned Langley a full-scale IQ score of 69, a verbal scale IQ score of 71, a verbal comprehension index of 72, a performance scale IQ score of 72, and a perceptual organization index of 70. (Tr. 280-81). However, the ALJ determined that Langley's IQ score was of "questionable validity" because of her lifestyle and activities. (Tr. 540). Langley disagrees with the ALJ. Langley claims that her sporadic work history demonstrated that she never had substantial gainful activity. Likewise, Langley asserts that her activities of daily living also do not suggest that the IQ scores were invalid. Langley lived with her boyfriend who helped to care for her children, to cook, and to clean because of her asthma. (ECF No. 10 at 9). She could only wash dishes. Langley also testified that she had difficulty understanding the stories in the books she read her 11, 13, and 14 year old children. (Tr. 582). She also testified that she could not understand newspapers or magazine and could not follow a recipe. (Tr. 582-83). Langley claims that she requires help from others to fill out applications and to prepare paperwork for school and for Social Security. (Tr. 583). Langley maintains that this evidence supports adaptive functioning deficits to satisfy the listing. (ECF No. 10 at 9). In addition to a valid IQ score to satisfy the requirements of Listing 12.05C, Langley claims that the records support onset of the intellectual disability before the age of 22. (ECF No. 10 at 9). Langley claims that, although she does not have an IQ score prior to age 22, an IQ at an earlier age may

be inferred from the record. (ECF No. 10 at 9-10). Langley claims that her history of special education classes, quitting school, problems with reading, writing and math, and her behavioral problems are all sufficient to demonstrate an intellectual disability that manifested before age 22. (ECF No. 10 at 10). Finally, Langley asserts that she satisfies the final requirement of Listing 12.05C, a physical or other mental impairment imposing an additional and significant work-related limitation of function. (ECF No. 10 at 10). Langley claims that the ALJ's finding that she suffered additional severe impairments, including asthma/bronchitis, obesity, scoliosis, anxiety, and depression. (ECF No. 10 at 11 (citing Tr. 539)). Langley maintains that a finding of these additional severe impairments is sufficient to satisfy the requirement of Listing 12.05C.

Langley further asserts that, even if the full-scale IQ score of 69 was not found to satisfy the listing, then remand is still required because the ALJ did not address whether Langley's impairments equaled Listing 12.05C. Langley claims that the ALJ should have addressed whether the combined effect of her impairments medically equals a listed impairment, even if she did not have a requisite full-scale IQ. (ECF No. 10 at 11 (citing *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003) ("The regulations provide that if a claimant has more than one impairment, the combined effect of the impairments will be considered.")). Langley states that, as in *Shontos*, there is no evidence that the ALJ considered the Program Operations Manual System ("POMS") guidelines, particularly POMS, Section DI 24515.0565. (ECF No. 10 at 11; *Shontos*, 328 F.3d at 424 ("Although POMS guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines.")); https://secure.ssa.gov/poms.nsf/lnx/0424515056 (Evaluation of Specific Issues--Mental Disorders—Determining Medical Equivalence). Langley notes that her full-scale IQ was only 69 and that she scored in the borderline range of verbal comprehension, perceptual

11

organization, and demonstrated borderline range scores: verbal scale IQ of 71, performance scale IQ of 72, and perceptual organizational index of 70. (ECF No. 10 at 12 (citing Tr. 280-81). Therefore, Langley maintains that, at a minimum, remand is necessary to consider listing 12.05C.

Under listing 12.05C, a claimant's cognitive impairment is disabling if she has significantly sub-average general intellectual functioning with deficits in adaptive functioning that initially manifested prior to age 22, and if she has a valid verbal, performance, or full scale IQ of 60 through 70 with a physical or other mental impairment that imposes an additional and significant work-related limitation of function. The claimant bears the burden of establishing that an impairment meets all of the criteria of a listing. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).

The ALJ considered Langley's questionable BIF under listing 12.05C. (ECF No. 16 at 5 (citing Tr. 540)). The ALJ found that the impairment did not meet or medically equal the listing because Langley's IQ scores, the lowest of which was a full IQ score of 69, were of questionable validity. In particular, the ALJ noted the scores' inconsistency with Langley's previous work activity and activities of daily living. (Tr. 540). *See Ash v. Colvin*, 812 F.3d 686, 691 (8th Cir. 2016) (affirming the ALJ's finding that the claimant did not meet Listing 12.05C because the claimant had only mild restriction in her activities of daily living and that she had moderate difficulties in social functioning, concentration, and persistence). The ALJ ultimately concluded that Langley did not meet listing 12.05C because she did not have the requisite deficits in adaptive functioning. (Tr. 540). The ALJ noted Langley's extensive work history, including a variety of jobs in the restaurant industry such as cashier, cook, and dishwasher. (Tr. 149, 178, 540, 747). She performed these jobs for several years, beginning almost immediately after she

left school in twelfth grade and despite her supposed BIF. (Tr. 267-68). Langley also continued to work after her June 2008 alleged onset of disability. (Tr. 178). Further, the reason Langley quit working was unrelated to her mental impairments; rather, she claims she was fired because her lung collapsed. (Tr. 268). *Cheatum v. Astrue*, 388 F. App'x 574, 576-77 (8th Cir. 2010) (claimant failed to establish the deficits in adaptive functioning necessary to meet Listing 12.05C where "evidence also showed that Cheatum had maintained employment in semi-skilled and unskilled positions for many years"). Her claim that she never worked at the substantial gainful activity level is also suspect because she was paid in cash at her most recent employment. Further, the Court holds that the ALJ properly considered Langley's daily activities in evaluating Listing 12.05C. Specifically, Langley was able to care for personal needs and hygiene, cared for her children, and performed other chores until her asthma began to bother her. (Tr. 269). Langley stated that she did not have any problems with memory, concentration, or understanding and following instructions. (Tr. 158, 160-61). Langley needed help performing some of her daily activities because of lung problems, not because of her BIF. (Tr. 156, 158). Although she was enrolled in special education classes, she had a successful work history. *See Ash*, 812 F.3d at 691 ("evidence of [claimant's] ability to work is relevant to show whether or not she has demonstrated the required deficits in adaptive functioning"). The ALJ properly considered Langley's daily activities in evaluating Listing 12.05C, which showed that she did not have deficits in adaptive functioning as required by Listing 12.05C.

Further, the Court holds that consideration of POMS, section DI 24515.056, was not required in this case. Langley's lowest IQ score, which is the score the agency considers for purposes of evaluating Listing 12.05C, was a 69. (Tr. 280-81). Because this score is outside the range of IQ score contemplated by POMS, section DI 24515.056, POMS does not apply in this

13

case. *Cf. Shontos*, 328 F.3d at 421 (IQ was 72); *Hesseltine v. Colvin*, 800 F.3d 424, 462 (8th Cir. 2015) (IQ was 71). In any event, remand is not required in this case. Based upon her extensive daily activities and successful work history, the ALJ properly concluded that Langley did not have the deficits in adaptive functioning required by listing 12.05C. (Tr. 540). The ALJ considered Langley's questionable BIF for medical equivalency, and the ALJ's medical equivalency finding is supported by substantial evidence. *See Ash*, 812 F. 3d at 693 ("That the ALJ characterized Ash's impairment as mild mental retardation at step two did not preclude the ALJ on this record from finding at step three that Ash did not exhibit deficits in adaptive functioning."). Therefore, the Court holds that the ALJ's determination is supported by substantial evidence.

B. RFC

Langley further claims that the ALJ erred by failing to craft a proper RFC. Langley claims that the ALJ improperly afforded great weight to the opinion of the non-examining State agency consultant, Dr. Morgan. (ECF No. 10 at 13 (citing Tr. 553)). Langley complains that, after affording the opinion great weight, the ALJ did not adopt all of the limitations in the RFC and the ALJ did not explain why did not include some of the limitations. (ECF No. 13 at 13). Langley maintains that the ALJ committed remandable error by affording the consulting physician's opinion great weight but failing to adopt the limitations in that opinion or at least discrediting the opinion. (ECF No. 10 at 13). The non-examining State agency doctor, Dr. Morgan, opined that Langley would be moderately to markedly limited in her ability to maintain attention and concentration for extended periods. (Tr. 296). Dr. Morgan also opined that Langley was moderately limited in her ability to understand, remember, and carry out detailed instructions and to respond appropriately to changes in the work setting. (Tr. 296-97). Langley

14

complains that the ALJ limited her to simple, routine tasks, but provided no corresponding limitation for Dr. Morgan's opinion that Langley would have a moderate to marked limitation in her ability to maintain attention and concentration for extended periods or a moderate limitation in her ability to respond appropriately to changes in the work setting. (ECF No. 10 at 14). Langley contends that the ALJ's limitation to simple and routine tasks does not account for her moderate limitation in her ability to maintain attention and concentration for two hour periods. (ECF No. 10 at 14-15 (citing *Logan-Wilson v. Colvin*, No. 4:13-CV-1119-JAR, 2014 WL 4681459, at *6 (E.D. Mo. Sept. 19, 2014)).

"Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "The duty of deciding questions of fact, including the credibility of [Williams'] subjective testimony, rests with the Commissioner." *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." *Gregg*, 354 F.3d at 714 (citing *Russell v. Sullivan*, 950 F.2d 542, 545 (8th Cir. 1991)).

The ALJ found at step four that Langley had the physical RFC to perform a range of light work and the mental RFC to perform simple, routine tasks. (Tr. 541). As previously stated, the ALJ considered the opinion of State agency reviewing physician Dr. Morgan in determining Langley's RFC. The ALJ afforded Dr. Morgan's opinion considerable weight, not controlling weight. (Tr. 553). This means that the ALJ found his limitations credible to the extent that they were consistent with the evidence in the record as a whole. (Tr. 553). Langley's claimed limitations were contradicted by evidence in the record, including her normal examination findings, minimal mental health treatment, and the efficacy of her depression and anxiety

medication once she started taking medication. (ECF No. 16 at 12-13 (citing Tr. 233, 265, 269, 280, 371, 387, 399, 422, 431, 444, 486, 516, 580, 793, 808, 816, 834, 849, 856, 868, 874, 882, 889, 902, 928, 933, 942, 947, 952, 961, 996, 1008, 1013, 1022, 1030, 1041, 1048, 1068, 1079, 1110, 1134, 1201, 1212, 1267, 1270, 1272-74, 1278, 1346, 1412, 1418, 1436, 1476)). Again, her proposed limitations were contradicted by Langley's extensive daily activities, her work history, and her quitting work for reasons unrelated to her impairment.

In any event, the limitations that Langley claims should have been included in the RFC were not actually a part of Dr. Morgan's opinion. The limitations that Langley references were included in "Section I" entitled "Summary Conclusions." "POMS § DI 24510.060.B.2 provides that **'Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment.'** POMS § DI 24510.060.B.2." *Teal v. Colvin*, No. 1:11CV191 SNLJ/FRB, 2013 WL 1363727, at *18 (E.D. Mo. Mar. 18, 2013), *report and recommendation adopted*, No. 1:11-CV-191 SNLJ, 2013 WL 1363714 (E.D. Mo. Apr. 2, 2013) (emphasis in original). Rather, Dr. Morgan's opinions are included in Section III, the Functional Capacity Assessment portion of the form, which is where "the **actual mental RFC assessment is recorded,** explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Teal*, 2013 WL 1363727, at *18 (emphasis in original). "Because the actual assessment is contained in Section III, courts have consistently held that it is not error for an ALJ to omit restrictions identified in Section I in his RFC analysis." *Teal*, 2013 WL 1363727, at *18 (citing *Sitzman v. Astrue,* 2012 WL 1437281, *9 (D.Neb.2010); *Kane v. Astrue,* 2011 WL 3353866, *3 (N.D.Ohio 2011)). Therefore, the Court holds that the ALJ was not required to include the above limitations in Langley's RFC. Moreover, even if

those limitations were a part of Dr. Morgan's opinion, they were inconsistent with the record and the ALJ properly excluded them from Langley's mental RFC. The Court holds that the ALJ's mental RFC finding is supported by substantial evidence and affirms the ALJ's decision.

## VI.     Conclusion

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 19th day of August, 2016.

*/s/ Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE